### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

Katrina Plourde

   v.                                                   Civil No. 10-cv-595-JD

Michael J. Astrue, Commissioner,
Social Security Administration


### REPORT AND RECOMMENDATION


Pursuant to 42 U.S.C. § 405(g), Katrina Plourde moves to
reverse the Commissioner's decision denying her application for
Social Security disability insurance benefits under Title II of
the Social Security Act, 42 U.S.C. § 423.  The Commissioner, in
turn, moves for an order affirming his decision.  For the
reasons that follow, I recommend that the decision of the
Administrative Law Judge ("ALJ") be affirmed.


### Standard of Review

The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d at 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the

[Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[ ] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts, document no. 18.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Plourde has a history of asthma.  In early October of 2008, she went to the emergency room complaining of back pain that resulted from lifting a box at work.[1]  She last worked on October 31, 2008, when she was laid off because her employer moved its operations overseas.

---

[1] The record also includes evidence of a 2005 emergency-room visit for a work-related back injury.

Diagnostic imaging of Plourde's back has revealed: (1) in July of 2008: "mild degenerative changes in the lumbar area including mild spurring on the left side at L2/3," Administrative Transcript ("Tr.") 201; (2) in November of 2008: "[l]eft foraminal herniation of the L2/L3 intervertebral disk that slightly impinges on the exiting left-sided L2 nerve roots within this foramen" and "[m]ild degenerative changes of the L5/S1 apophyseal joints," Tr. 281-82; and in April of 2010, this:

1.   A left foraminal disk herniation at L2-3 appears to have gotten smaller since the previous study with less mass effect upon the left L2 nerve root.

2.   Some L4-5 degenerative changes are otherwise stable.  This includes what is potentially a tiny central disk herniation superimposed upon a broad based disk bulge.  There is no clear evidence of neural compression at this level.

3.   There is no definite evidence for neural compression on the current study to explain the patient's new right leg symptoms.

Tr. 415 (capitalization omitted).

Plourde has received the following relevant impressions, assessments, and diagnoses: (1) lumbrosacral radiculopathy; (2) lumbar spine L2/L3 disc herniation with left-sided nerve root irritation; (3) L4-5 disc with degenerative changes; (4) lumbrosacral strain; (5) paralumbar muscle spasm; (6) intermittent right lower extremity sciatica complicated by a

4

herniated nucleus pulposus L2/L3 and left L2 nerve root impingement; (7) lumbrosacral sprain/strain; (8) lumbar facet joint disease; and (9) lumbar radiculitis.

For treatment of her back condition, Plourde has seen, among others: (1) Dr. Christopher Almeida of the Occupational Health Services practice at Lakes Region General Hospital (just over 30 visits from October of 2008 through April of 2010);[2] (2) Dr. James Mirazita of "Pain Solutions" (approximately seven visits from November of 2008 through March of 2010); and Dr. Thomas Rock of Orthopedic Professional Association (visits in May of 2009 and March of 2010).[3] Her treatment has included: physical therapy, home exercise, epidural injections, radio frequency lesioning of the lumbar facet joints, prednisone pulse therapy, use of a back brace, and several medications including Vicodin, Darvocet, Zanaflex, Gabapentin, and Percocet. Dr. Rock has recommended surgery, but Plourde has been unable to afford it.

---

[2] Dr. Almeida also treated Plourde after her work-related back injury in 2005.

[3] Plourde was seen approximately six times between November of 2008 and April of 2010 by Timothy O'Brien, a physician's assistant in Dr. Rock's practice.

Four days after her work-related injury on October 2, 2008,
Plourde saw Dr. Almeida.  In his treatment note from that visit,
he concluded by outlining the following plan:

> The patient is to complete the course of Medrol
> Dosepak and then Advil . . . [and] Flexeril [for]
> muscle spasm, a Disc Unloader back brace, physical
> therapy evaluation with biweekly treatments.  . . .
> The patient's past medical record was reviewed and
> taken into consideration in the decision making
> process.  The patient can return to work as of
> 10/06/2008, modified duty expected to last one week.
> She is to return to Occupational Health Services in
> one week for reevaluation as she has not reached her
> maximal medical potential.  However, she has a good
> prognosis for full recovery [from] this injury.

Tr. 407.  A similar paragraph appears at the end of each the
remaining thirty treatment notes Dr. Almeida wrote after seeing
Plourde.  The recommended treatments change from note to note,
but each calls for an immediate return to work, with a need for
modified duty that is expected to last for between one and six
weeks.  Dr. Almeida's most recent note, from April of 2010,
called for four weeks of modified duty.  As the parties note in
their Joint Statement of Material Facts, Dr. Almeida does not
specify any particular modifications of Plourde's work
activities.  Finally, each of the treatment notes, except for
the penultimate one, opined that Plourde had a good prognosis
for a full recovery.  The one note that is out of step with the
others said that Plourde's prognosis was guarded.  See Tr. 347.

The record also includes ten New Hampshire workers'
compensation medical forms, one completed by Dr. Almeida (in
November of 2008); four completed by Dr. Rock (between November
of 2008 and March of 2010); and five completed by Timothy
O'Brien, a physician's assistant in Dr. Rock's practice (between
December of 2008 and April of 2010).

In his form, Dr. Almeida opined that Plourde could: (1)
lift and/or carry five pounds frequently and ten pounds
maximally; (2) bend, kneel, squat, and climb frequently; and (3)
stand, walk, sit, reach, drive, and perform fine motor tasks
without restriction.  See Tr. 280.  Ten days later, Dr. Rock did
not rate Plourde's ability to lift and/or carry, but did opine
that Plourde was unable to: bend, kneel, squat, climb, stand,
walk, sit, reach, drive, or perform fine motor tasks.  See Tr.
438.  That opinion, i.e., that Plourde was completely unable to
perform any work-related activities, is repeated in each of the
other three worker's compensation forms Dr. Rock completed, as
well as the five that P.A. O'Brien completed.

In January of 2009, state-agency consultant Dr. Jonathan
Jaffe completed a Physical Residual Functional Capacity ("RFC")
Assessment on Plourde.  He opined that she could: (1) lift
and/or carry twenty pounds occasionally and ten pounds
frequently; (2) stand and/or walk (with normal breaks) for about

six hours in an eight-hour workday; (3) sit (with normal breaks) for about six hours in an eight-hour workday; and (4) push and/or pull with no limitations other than those on lifting and/or carrying.  He further opined that Plourde had the capacity to occasionally perform all postural activities (<u>i.e.</u>, climbing ramps/stairs and ladders/ropes/scaffolds, balancing, stooping kneeling, crouching, and crawling).  Finally, he determined that Plourde had no manipulative, visual, communicative, or environmental limitations.

In April of 2010, Dr. Rock completed a Medical-Source Statement of Ability to do Work-Related Activities (Physical) on Plourde.  He determined that she could: (1) lift and/or carry a maximum of five pounds; (2) stand and/or walk (with normal breaks) for sixty to ninety minutes in an eight-hour workday; (3) sit (with normal breaks) for two to three hours in an eight-hour workday; and (4) push and/or pull so long as she avoided twisting or torque on the spine.  He further opined that she could occasionally perform all postural activities except for climbing ladders, ropes, or scaffolds, which she could never do. With regard to manipulative activities, Dr. Rock opined that Plourde had an unlimited capacity for fingering and feeling, but could only occasionally engage in reaching and handling.  Like Dr. Jaffe, Dr. Rock found no visual or communicative

limitations.  He did, however, find that while Plourde had an unlimited capacity to deal with noise, dust, and fumes, she had a limited capacity to deal with temperature extremes, vibration, humidity/wetness, and hazards (machinery, heights, etc.).  The record also includes two opinion letters from Dr. Rock to Plourde's attorney (from September of 2009 and April of 2010), but the focus of those letters appears to be whether Plourde's back injury was work-related, not her residual functional capacity.

Plourde received a hearing before the ALJ, who took testimony from her and from a vocational expert ("VE").  The ALJ's first hypothetical question to the VE was based on an individual who: (1) was limited to light work involving routine and repetitive tasks; (2) could not climb ladders, ropes, or scaffolds; (3) needed to avoid unprotected heights, extreme temperatures, and humidity; and (4) could tolerate only moderate exposure to odors, dust, fumes, gasses, and poor ventilation. The VE opined that such a person could perform Plourde's past relevant work as a housekeeper as well as several other jobs in the national economy.  The ALJ posed three more hypothetical questions that involved the following limitations: (1) a need to stand for two or three minutes every hour; (2) an ability to stand and/or walk for only four hours in an eight hour workday;

and (3) a loss of attention for ten minutes every hour, due to pain or side effects from medication.  According to the VE, only the last of those limitations would preclude a person from working.  Finally, the ALJ stated for the record that if she adopted the limitations stated in Dr. Rock's functional capacity assessment, she would be compelled to determine that Plourde was disabled.

After the hearing, the ALJ issued a decision that includes the following findings of fact and conclusions of law:

> 3.  The claimant has the following severe impairments: degenerative disc disease at L4-5, herniated disc at L2-3, and asthma (20 CFR 404.1520(c)).
>
> . . . .
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> . . . .
>
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can have no exposure to unprotected heights and perform no climbing of ropes, ladders, or scaffolds.  She must avoid extreme temperatures and humidity and have no more than moderate exposure to dust, fumes, odors, gasses, and poorly ventilated areas.  She is limited to routine and repetitive tasks.
>
> . . . .

6.  The claimant is capable of performing past
relevant work as a housekeeper.  This work does not
require the performance of work-related activities
precluded by the claimant's residual functional
capacity (20 CFR 404.1565).

Tr. 9, 10, 14.  After determining that Plourde retained the

residual functional capacity to perform past relevant work, the

ALJ went on to find, in the alternative, that she had the

capacity to work as a small products assembler, as a

classifier/sorter of commercial laundry, and as a counter

attendant in a lunch room.

## Discussion

Plourde's motion to reverse the Commissioner's decision is

not a model of clarity.  That said, Plourde appears to argue

that the decision should be reversed for the following three

reasons: (1) "the ALJ committed error . . . by attempting to

substitute her lay opinion as to the significance of MRI

findings for that of medical experts," Cl.'s Mot. to Rev. (doc.

no. 13), at 3; (2) "the ALJ committed error and acted

unreasonably in assessing the appropriate weight to be given to

[her] treating orthopedic surgeon, Dr. Rock, specifically by

giving his opinion less weight than legally appropriate while

giving Dr. Almeida's opinion more weight than legally

appropriate in comparison," id. at 7; and (3) "[t]he failure of

the ALJ to appropriately assess [her] residual functional

capacity resulted in further error whereas the ALJ thereafter

based her hypothetical questions to the vocational expert on an

inappropriate RFC," id. at 16.  The Commissioner disagrees,

categorically.

### A. The Legal Framework

To be eligible for disability insurance benefits, a person

must: (1) be insured for such benefits; (2) not have reached

retirement age; (3) have filed an application; and (4) be under

a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question

in this case is whether Plourde was under a disability.

For the purpose of determining eligibility for disability

insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if [her] physical or mental impairment
> or impairments are of such severity that [she] is not
> only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in
> which [she] lives, or whether a specific job vacancy
> exists for [her], or whether [she] would be hired if
> [she] applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which

> exists in the national economy" means work which
> exists in significant numbers either in the region
> where such individual lives or in several regions of
> the country.

42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, in the context of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process. See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). She must do so by a preponderance of the evidence. See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)). Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) plaintiff's
> subjective claims of pain and disability as supported
> by the testimony of the plaintiff or other witness;
> and (3) the plaintiff's educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

### B. Plourde's Arguments

Plourde advances three arguments in favor of reversal.  The

court considers each in turn.

### 1. Lay Opinion on Medical Evidence

Plourde's first argument is that the ALJ impermissibly

relied on her own lay opinion on the significance of certain

magnetic resonance imaging ("MRI") results instead of the

opinion of a medical expert, specifically, Dr. Rock.  While

Plourde characterizes the ALJ's purported mistake as a

reversible error, she does not identify where, in the five-step

evaluation process, that error manifested itself.[4]  That, in

---

[4] The particular findings Plourde challenges appear in the portion of the ALJ's decision devoted to assessing the credibility of her statements about her symptoms, but because Plourde cites none of the relevant law, the court has no reason to think that she is challenging the ALJ's credibility assessment.

turn, severely limits the court's ability to engage in meaningful legal analysis.

In any event, Plourde points out that the ALJ mistakenly referred to an X-ray from 2008 as an MRI, and then erroneously discounted the significance of an actual MRI from November of 2008.  The ALJ's misstatement about the 2008 X-ray is a minor error with no legal significance.  The balance of Plourde's argument is difficult to follow, but its focus appears to be the ALJ's finding that "there was no evidence of neural compression to explain the claimant's right leg symptoms," Tr. 12, and her subsequent conclusion that "[t]hese findings do not support the extent of the claimant's allegations of pain and functional limitation," id.  Here is the problem.  Dr. Michael Dowe's report on Plourde's MRI from April of 2010 concludes this way: "There is no definite evidence for neural compression on the current study to explain the patient's new right leg symptoms." Tr. 415.  That is precisely the evidence the ALJ cites as supporting her finding that "there was no evidence of neural compression to explain the claimant's right leg symptoms," Tr. 12.  Surely, Dr. Dowe's report is more than a mere scintilla of evidence supporting the ALJ's finding.  See Currier, 612 F.2d at 597.  Because Dr. Dowe's MRI report is evidence a reasonable mind might accept as adequate to support the ALJ's virtual

paraphrase of that report, Plourde's first argument is
unavailing.  See id.

### 2. Weight Given to Medical-Source Opinions

The ALJ gave significant weight to the opinion of Dr.
Almeida and some weight to the opinions of Drs. Jaffe and Rock.
Plourde argues that the ALJ should have given controlling weight
to Dr. Rock's medical source statement on her ability to perform
work-related activities.  She also argues the even if the ALJ
was entitled to give Dr. Rock's opinion less than controlling
weight, she misapplied the relevant factors for weighing medical
opinions and, as a consequence, erroneously and unreasonably
assigned greater weight to Dr. Almeida's opinion than she
assigned to Dr. Rock's opinion.  Legally, Plourde argues that
the ALJ violated the requirements of 20 C.F.R. § 404.1527(d) and
Social Security Ruling ("SSR") 96-2p by failing to provide good
reasons for giving greater weight to Dr. Almeida's opinion than
to that of Dr. Rock.  The Commissioner contends that the ALJ
permissibly assessed the medical-opinion evidence.  The court
agrees.

This case presents a rather unusual situation.  Rather than
arguing that the ALJ erred by according greater weight to the
opinion of a non-treating or non-examining medical source than
she gave to the opinion of a treating source, Plourde is arguing

that the ALJ erred by giving greater weight to the opinion of one treating physician than she gave to the opinion of another treating physician.  That said, the court presumes that when the ALJ weighed the opinions of two treating physicians, she was obligated to consider the factors described in 20 C.F.R. § 404.1527(d).  Moreover, in the analysis that follows, the court is guided by the principle that "the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz, 955 F.2d at 769.

In her decision, the ALJ explained her reasons for giving Dr. Rock's opinion some weight, but less than the significant weight she gave Dr. Almeida's opinions: "His opinion is not consistent with his own treatment notes; objective examination indicated that the claimant had greater abilities than those alleged or those indicated by Dr. Rock."  Tr. 13.  Plourde calls that explanation unsupported, inaccurate, and impermissible.  It is not.

To begin, the ALJ's characterization of Dr. Rock's opinion as inconsistent with his own treatment notes is accurate.  In the one note by Dr. Rock that includes a treatment plan, the one he wrote on May 14, 2009, Dr. Rock reported the results of a physical examination, including these: "[S]he has maintained ability for walking, flexing, extension.  Her strength is 5/5,

reflexes are intact with preserved sensation." Tr. 429.  He
began his treatment plan this way: "At this point, she is unable
to work.  She cannot do any heavy lifting, bending or twisting
due to her condition . . . ."  Id.  Notwithstanding Dr. Rock's
statement in his treatment note that Plourde "has maintained
ability for walking," Tr. 429, in a workers' compensation form
he completed on the same day as his treatment note, Dr. Rock
said that Plourde was "unable" to walk.  Tr. 428.  Leaving aside
the questionable proposition that a person who cannot perform
heavy lifting, bending or twisting is completely unable to work,
the inconsistency between Dr. Rock's treatment note and his
workers' compensation form, both dated May 14, 2009, is
substantial evidence supporting the ALJ's decision to give
limited weight to Dr. Rock's opinion.  When assessing medical
opinions, an ALJ should take into account their consistency with
other evidence in the record, see 20 C.F.R. § 404.1527(d)(4),
and here, Dr. Rock's statements on Plourde's ability to walk are
not even consistent with one another.

     Moreover, the ALJ's decision comports entirely with the
relevant regulations.  Those regulations specify that a treating
physician's opinion may be given controlling weight only if it
is not inconsistent with the other substantial evidence in the
record.  See 20 C.F.R. § 404.1527(d)(2); see also SSR 96-2p,

1996 WL 374188, at *2 (explaining that to be entitled to
controlling weight, a "treating source's medical opinion must
also be 'not inconsistent' with the other 'substantial evidence'
in the individual's case record").  Here, the opinions in Dr.
Rock's medical-source statement are inconsistent with: (1) his
own treatment notes (which indicate a greater capacity for
performing work-related activities);[5] (2) the opinions expressed
in his workers' compensation evaluations (which indicate a
lesser capacity for performing work-related activities);[6] (3) the
opinions in Dr. Jaffe's RFC Assessment; and (4) the opinions
expressed in Dr. Almeida's thirty treatment notes.  Thus, the
ALJ did not err in declining to afford controlling weight to the
opinion expressed in Dr. Rock's medical-source statement.

The ALJ also committed no error by giving greater weight to
Dr. Almeida's opinion than she gave to Dr. Rock's opinion, based
on the criteria described in 20 C.F.R. § 404.1527(d)(1)-(6).

---

[5] In his medical-source statement, Dr. Rock said Plourde
could stand and/or walk for sixty to ninety minutes in an eight-
hour workday.  See Tr. 439.  In his treatment note of May 14,
2009, Dr. Rock reported that Plourde had "maintained ability for
walking," Tr. 429, and indicated no limitations on that ability.

[6] In his medical-source statement, Dr. Rock said Plourde
could stand and/or walk for sixty to ninety minutes in an eight-
hour workday, sit for two to three hours in an eight-hour
workday, and that she could occasionally climb ladders and
stairs, and kneel.  See Tr. 439-40.  In his workers'
compensation forms, he consistently reported that Plourde could
never sit, stand, walk, climb, or kneel.  See Tr. 421, 428, 430,
438.

Both Drs. Almeida and Rock were treating sources, but Dr. Almeida saw Plourde more than thirty times, while Dr. Rock saw her only twice.  Even adding in Plourde's visits with Dr. Rock's physician's assistant, Plourde saw Dr. Almeida four times more often than she visited any provider at Dr. Rock's practice. That is substantial evidence in support of the ALJ's decision to give greater weight to Dr. Almeida's opinion.  See 20 C.F.R. § 404.1527(d)(2)(i).  Beyond that, Dr. Almeida provided considerably more than Dr. Rock did in the way of treatment; while each of Dr. Almeida's thirty plus treatment notes concludes with a detailed assessment and plan, neither of Dr. Rock's notes includes any formal impression or assessment, and only the earlier of the two includes a treatment plan.  (By contrast, each of P.A. O'Brien's notes includes both a formal assessment and a detailed treatment plan.)  In sum, as compared with Dr. Rock, Dr. Almeida had the deeper and more comprehensive treatment relationship with Plourde, by a substantial margin, which also supports the ALJ's determination.  See 20 C.F.R. § 404.1527(d)(2)(ii).

Plourde seems to suggest that Dr. Rock's opinion is more supportable than Dr. Almeida's opinion because "Dr. Rock alone of all the treatment providers of record had the benefit of reviewing the most extensive medical record."  Cl.'s Mot. to

Rev. (doc. no. 13), at 10.  Of course, a substantial portion of

the extensive medical record available for Dr. Rock's review was

made up of Dr. Almeida's treatment records – not the "medical

signs and laboratory findings" contemplated in 20 C.F.R. §

404.1527(d)(2)(3).  Be that as it may, Dr. Rock's access to Dr.

Almeida's treatment notes for subsequent review is surely no

basis for giving greater weight to Dr. Rock's opinion than the

opinion of the medical source whose treatment generated the

notes Dr. Rock had the benefit of reviewing.  The question here

is which treating source's opinion deserves greater weight, and

regardless of whatever Dr. Rock was able to review, Dr. Almeida

had the benefit of examining and treating Plourde more than

thirty times.

The factor of consistency with the record as a whole also

supports the ALJ's determination.  See 20 C.F.R. §

404.1527(d)(4).  Dr. Almeida's opinion is generally consistent

with: (1) Dr. Jaffe's opinion; (2) treatment notes from

Plourde's physical therapist;[7] and (3) the fact that Plourde

continued to work for nearly a month after her 2008 back injury,

and left her job not because of a physical inability to perform

it, but because she was laid off due to outsourcing.  The court

_____

[7] As of December 16, 2008, Plourde's physical therapist
reported that she was able to lift twenty pounds from floor to
waist with a minimal increase in symptoms and was able to
push/pull thirty-five pounds without symptoms.  See Tr. 255.

has already described the ways in which Dr. Rock's opinion is
inconsistent with various other parts of the record.  As between
the two treating-source opinions, Dr. Almeida's is more
consistent with the record as a whole.

Plourde also identifies Dr. Rock's status and
specialization as Plourde's "treating orthopedic surgeon" as a
basis for giving his opinion greater weight.  See 20 C.F.R. §
404.1527(d)(5).  Referring to Dr. Rock as a treating surgeon may
overstate things a bit, as Dr. Rock recommended surgery, but has
not operated on Plourde.  Beyond that, given that Dr. Almeida is
a member of the Occupational Health Services practice at Lakes
Region General Hospital, it would appear to understate his
credentials to say that he does not have a relevant area of
specialty.  If anything, Dr. Almeida's membership in the
Occupational Health Services practice is cause for giving more
weight to his opinion on Plourde's capacity to perform work-
related activities.

In her decision, the ALJ noted the length and nature of Dr.
Almeida's treatment relationship with Plourde, the support for
his opinion that may be found in his treatment notes, and the
consistency of his opinion with the record evidence.  In sum,
the ALJ more than fulfilled her duty to provide good reasons for

giving more weight to Dr. Almeida's opinion than she gave to Dr. Rock's opinion.  <u>See</u> 20 C.F.R. § 404.1527(d)(2).

### 3. The ALJ's Hypothetical Question

Plourde also argues that the ALJ erred by making a decision that was based on VE testimony that was, in turn, based on a hypothetical question that incorporated an erroneous RFC. Because the court finds no error in the manner in which the ALJ determined Plourde's RFC, Plourde's third argument necessarily fails.

### Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Plourde's claim, <u>see</u> <u>Manso-Pizarro</u>, 76 F.3d at 16, I recommend that: (1) Plourde's motion for an order reversing the Commissioner's decision, document no. 13, be denied; and (2) the Commissioner's motion for an order affirming his decision, document no. 17, be granted.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  <u>See</u> Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See</u> <u>United States v. De Jesús-Viera</u>, 655 F.3d 52, 57 (1st Cir. 2011) (citing <u>United States v. Lugo Guerrero</u>, 524 F.3d

5, 14 (1st Cir. 2008)); <u>Sch. Union No. 37 v. United Nat'l Ins.</u>
<u>Co.</u>, 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly
raised by objections to magistrate judge's report are subject to
review by district court; issues not preserved by such objection
are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge


December 22, 2011

cc:  Shawn E. Nichols, Esq.
     Robert J. Rabuck, Esq.